IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GEP ADMINISTRATIVE SERVICES,  )
LLC, d/b/a Entertainment Partners,  )
                                        )
      Plaintiff,  )       NO. 3:24-cv-00256
                                          )       JUDGE RICHARDSON
v.  )
                                          )
MELISSA WISEMAN,  )
                                          )
      Defendant.  )

## <u>MEMORANDUM OPINION</u>

On March 5, 2024, Plaintiff GEP Administrative Services LLC, d/b/a Entertainment Partners, ("Plaintiff" or "GEP")[1] initiated this action by filing a complaint against Defendant Melissa Wiseman ("Defendant"), bringing claims against her based on alleged violation of the Defend Trade Secrets Act, 18 U.S.C. § 183; alleged violation of the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, *et seq.*; and alleged breach of contract. The following morning, on March 6, Plaintiff filed a "Motion for Temporary Restraining Order and Preliminary Injunction" (Doc. No. 8, "Motion"), supported by, among other things, a memorandum of law in support thereof (Doc. No. 8-3, "Plaintiff's Memorandum").

For the reasons discussed herein, the Motion is granted, in part, in that the Court will grant the requested temporary restraining order ("TRO"). The Motion will remain pending to the extent that it requests a preliminary injunction.

---

[1] The Court endeavors to use "Plaintiff" when discussing GEP Administrative Services LLC in its function as a party in this case and "GEP" when discussing GEP Administrative Services LLC as a place of business.

Defendant was employed by Plaintiff from about May 2012 through January 12, 2024, as a director in the Tax Incentives Department ("Department"). That Department provides various services to support major studio, streaming, and independent production clients' administration, placement, financing, and consultation regarding production incentive tax credits offered through various government tax incentive programs both domestically and abroad.

During her onboarding as a new hire, Defendant signed a "Confidentiality and Invention Assignment Agreement" on May 7, 2012, before she was allowed to access any of Plaintiff's internal systems, as is standard in Plaintiff's hiring process. The agreement protects Plaintiff's confidential business information and trade secrets. On January 11, 2024, Defendant (who in the meantime apparently had remained continuously employed with Plaintiff) submitted to Plaintiff a resignation letter indicating that she (Defendant) had accepted a vice president position with a direct competitor, TPC. Defendant said she could continue to work for Plaintiff until mid-to-late January 2024 and that her start date with TPC was February 12, 2024.

Before her departure from GEP, Defendant transmitted to her personal email accounts and devices files belonging to Plaintiff that contained Plaintiff's confidential information and trade secrets. When Plaintiff discovered this transfer of confidential information and trade secrets to her personal email accounts, Plaintiff immediately terminated Defendant's employment on January

---

[2] For purposes of ruling on a TRO, the Court typically takes as true facts that fit into the following categories: facts "(1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice." *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2019 WL 6050283, at *1 n.1 (M.D. Tenn. Nov. 15, 2019). Here, Defendant has not had a chance to respond, so the facts are primarily taken from the memorandum in support of the TRO (Doc. No. 8-3) and Complaint (Doc. No. 1) with evidentiary support coming from documents attached to the TRO and Complaint.

12, 2024, sent Defendant a cease-and-desist letter, and requested that Defendant sign a Declaration to certify that she deleted all electronic versions of Plaintiff's property from any email, cloud-storage, or other account or device that she had or controlled.

Defendant voluntarily submitted that declaration on January 16, 2024. In doing so, she asserted under oath that she had "permanently deleted any and all Confidential Information that [she] had in electronic form (including through double-deleting practices), or copies or versions thereof, from any devices owned or used by [her] outside of [Plaintiff's] workplace, including [her] personal email accounts, cloud storage accounts, computers, tablets, phones, and/or digital storage devices." (Doc. No. 8-7 at 20). However, as Plaintiff continued to investigate, Plaintiff realized Defendant had uploaded thousands of files into a file-share software program and sent several download links to her personal email accounts.[3]

The documents Defendant took include documents reflecting strategies, methods, techniques, processes, and procedures of Plaintiff's Tax Incentives Department ("Department"). Plaintiff describes the documents "highly confidential trade secrets that could devastate GEP's business in the hands of a competitor (like [Defendant]'s new employer, TPC)." (Doc. No. 8-3 at 3). These internal documents set out in detail the Department's value proposition, sales strategy, procedures and processes that "GEP has developed and refined over many years and at significant

---

[3] Though not entirely clear from Plaintiff's presentation of the facts, it appears from exhibits to the declaration of Plaintiff's counsel that as of the time of the January 16 declaration, Defendant had electronically "turned over" and deleted only about a dozen documents, but Plaintiff's subsequent investigation revealed that she had downloaded thousands of documents. (Doc. No. 8-7 at 22, 24-25). In Plaintiff's Memorandum, Plaintiff states that "[b]y comparing GEP's own digital copies of the files that Wiseman uploaded into the iManage share account, it became clear that someone—upon information and belief, Wiseman—appeared to have reorganized them." (Doc. No. 8-3 at 10). The Court takes this reference to "reorganiz[ation]" to be a reference to Defendant having "incrementally zip-filed" and "transmitted" thousands of documents. (Doc. No. 8-7 at 25).

expense." (*Id.* at 4). Competitors would value these documents because they detail the successful operation of a "niche business." (*Id.*)

The documents also include current client files of Plaintiff,[4] such as internal emails between Plaintiff and its clients on specific projects, revealing client identities, key personnel, their contact information, and project-specific details, such as budget spreadsheets, cost reports, tax credit refund reports, tax credit applications, information about customer characteristics, needs and preferences, and additional work product generated by Plaintiff for Plaintiff's clients. These files reveal client preferences, the financial terms of Plaintiff's client deals, and internal communications about Plaintiff's work product. A competitor like TPC could use this information to systematically solicit Plaintiff's clients, customize its pitches based on the client's preferences that were communicated to Plaintiff, and undercut Plaintiff's prices.

Other files relate to potential client projects including emails, proposals, and Plaintiff's rates for potential projects, and reveal the identities of Plaintiff's prospective clients, specific target projects, and Plaintiff's pricing for these projects. This data also includes strategic discussions on how best to win business. A competitor like TPC could use this information to mimic Plaintiff's strategies, improve its business processes, or undercut Plaintiff's prices.

---

[4] Two such documents are of noted importance. One document has information from Defendant's GEP email account for all of Plaintiff's business contacts, consisting of over 1,500 individual contacts, hundreds of which are the Department's client contacts. The second document is a spreadsheet containing over 1,600 entries, detailing contacts' identities, contact information, and what Plaintiff believes to be Defendant's personal notes on the contacts. The information contained within the Client Contact Lists is extremely valuable in the hands of a competitor, including TPC. It would take significant time, effort, and expense to manually create the Client Contact Lists, which Defendant (on behalf of Plaintiff and in her capacity as a GEP employee) cultivated for more than a decade during her employment with Plaintiff. Plaintiff alleges that Defendant's unlawful possession of this information poses an immediate and very real risk to Plaintiff's Tax Incentives business.

The documents also include Plaintiff's annual operating plans that include in part expected billings, a breakdown of operating costs, and information reflecting how much Plaintiff budgets for each vendor.[5] These documents detail the Department's revenue and cost allocation and would allow a competitor to know how much and where money is spent. A competitor like TPC could use these plans to improve its own efficiencies or negotiate better prices with third parties.

Immediately upon learning that Defendant still had access to confidential information, Plaintiff sent a second cease-and-desist letter on January 17, 2024, and provided a link to a secure server to which Defendant could upload any and all of Plaintiff's files that remained in her possession. Defendant uploaded more than 5,000 GEP files, despite having sworn just a couple of days prior that she possessed no such files.

No longer confident that Defendant had disposed of (all of) the materials as she had stated in her sworn declaration, on January 17, 2024, Plaintiff requested that Defendant submit her personal devices and accounts to an independent third-party forensic expert to confirm that Defendant no longer possessed any GEP confidential information or trade secrets. Plaintiff offered to enter into a confidentiality agreement with Defendant to protect Defendant's personal information and documents through the forensic examination process. Defendant repeatedly requested more time to retain counsel rather than submitting to the inspection. On February 7, 2024, Defendant indicated that she had retained counsel, and that same day, Plaintiff communicated to Defendant's counsel its demand to have Defendant's accounts and devices inspected by an independent forensic investigator to remove Plaintiff's confidential information and trade secrets.

---

[5] Plaintiff protects these plans at the document level with a specific password to avoid access by unauthorized users.

On February 9, 2024, Plaintiff agreed to allow Defendant's vendor of choice, Innovative Service Technology Management Services ("IST"), to perform the forensic inspection and remediation of Defendant's devices and accounts, subject to a protocol that would be agreed upon by both parties. Based on the representation that the forensic inspection and remediation would be agreed upon by the parties, as well as Defendant's agreement that she would defer her start date at TPC until an adequate and appropriate inspection and remediation took place, Plaintiff did not then seek emergency relief from the Court. Also on February 9, Defendant confirmed that she deferred her start date with TPC to February 26, 2024.

On February 12, 2024, Plaintiff requested more information about the forensic investigation, including the projected duration needed for the investigation to be completed and the details about what the investigation would entail. Defendant's counsel represented on February 13, 2024, that the "inspection [was] underway[.]" (Doc. No. 8-7 at 50). Plaintiff's counsel followed up with Defendant's counsel again on February 15, 20, 21, and 22, repeatedly seeking to confirm basic information about the timing and scope of the forensic inspection that Plaintiff believed had been underway since at least February 9. Because an adequate and appropriate inspection and remediation had not yet been confirmed, Defendant agreed on February 23 to defer her start date at TPC to March 4. Despite Plaintiff following up (by a combination of emails and a phone call) on February 26, 27, 28, and 29 and March 1, Plaintiff did not hear anything further from Defendant until March 1 when Defendant's counsel responded that the "logistics and practicalities of working with the forensic vendor took longer than expected over the past week," and that Defendant's counsel anticipated having more information the following week (the week of March 4, 2024). (Doc. No. 8-7 at 36). Defendant rejected Plaintiff's request to defer her start date with TPC to March 18, and she instead offered to defer her start date by one day to March 5. Defendant's

counsel sent Plaintiff's counsel a new sworn declaration signed by Defendant[6] and a statement (not made under penalty of perjury) from Arthur J. Schmeiser, Sr. Certified Computer Forensic Analyst from IST ("Schmeiser"). Schmeiser's statement reveals that he deleted files from Defendant's laptop that Defendant told him to delete; did not investigate whether Plaintiff's material has been copied to any of Defendant's devices or accounts or shared to any other location, such as external storage devices, cloud storage, or email; and Defendant's email accounts (which were used to store and transfer the confidential documents to Defendant's personal possession) were not examined but instead were "preserve[d]." (Doc. No. 8-7 at 78). Rather than provide Plaintiff with reassurances, Schmeiser's statement substantially increased Plaintiff's concern that Defendant continues to possess and is prepared to use Plaintiff's confidential information and trade secrets.[7]

Pursuant to Rule 65, Plaintiff filed an affidavit from Plaintiff's counsel stating that he provided to Defendant's counsel notice of the TRO and the relief sought and that Defendant's counsel represented that Defendant would oppose the relief.[8]

---

[6] From the email correspondence, it appears that this declaration was emailed on March 1. However, the declaration purports to be signed on March 4. This raises the question of whether Defendant was genuinely trying to resolve issues in a timely manner or intended to wait until the last moment to respond.

[7] While not essential to either the Motion or the Court's decision to grant a TRO, it is worth noting that Plaintiff retained a forensic-examination expert of its own to review Schmeiser's statement. That expert, Michael Kunkel, provided a sworn declaration (Doc. No. 8–9) stating his opinion that Schmeiser failed to perform an analysis designed to locate Plaintiff's materials or how they had been shared and instead only deleted specific files at specific location or preserved data. Plaintiff sources its presentation of facts to Kunkel's declaration, and while the Court's presentation of the facts here likewise draws on Kunkel's analysis (and Plaintiff's description thereof), the characterization of Schmeiser's Report herein is also supported by a plain reading of Schmeiser's report. (Nothing in this footnote should be taken at this time as an evidentiary determination on whether Kunkel is offering a lay or expert opinion.)

[8] As explained in a footnote below, Defendant's confidentiality agreement included a provision wherein Defendant accedes to injunctive relief that was needed to protect Plaintiff's confidential information. The Court need not address at this time whether such a provision is enforceable or whether any future response in opposition to a TRO or preliminary injunction in this case would be viewed as directly contradicting that

Plaintiff proposes a temporary restraining order that requires the return of Plaintiff's trade secrets and other confidential information; a prohibition on the use or sharing of the same; an accounting of all accounts and devices where Plaintiff's information was improperly accessed, stored, or transmitted; a third-party forensic examination and remediation of those accounts and devices; the preservation of relevant evidence relating to this matter; compliance with the confidentiality agreement; and that Defendant refrain from continuing her employment or services with TPC until the forensic examination and remediation is complete.

## LEGAL STANDARD

Those seeking a TRO or preliminary injunction under Federal Rule of Civil Procedure 65 must meet four requirements.[9] They must show a likelihood of success on the merits; irreparable harm in the absence of the injunction; that the balance of equities favors them; and that public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.,* 56 F.4th 400, 403 (6th Cir. 2022). Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with some evidence to substantiate their allegations. *See, e.g.*, *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012)

---

provision (and, if so, what the consequences would be of such contradiction). As described herein, the TRO is granted on the merits.

[9] Some published Sixth Circuit cases stand unmistakably for the proposition that these four items are *factors* rather than *requirements*, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with more recent Sixth Circuit case law and with Supreme Court case law (including the two cases cited above) describing these as all being requirements. The Court believes that it is constrained to follow the latter line of cases.

(upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, at *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)).

Before the Court may properly even consider the above requirements, however, a TRO movant must by rule comply with specific procedural requirements. *See Mendy v. Adams*, No. 3:23-CV-00594, 2023 WL 4190532, at *2 (M.D. Tenn. June 25, 2023). First, "[a]ny request" for a TRO "must be made by written motion separate from the complaint commencing the case." M.D. Tenn. L.R. 65.01(a). Second, in accord with the fact that the movant bears the burden of justifying preliminary injunctive relief, *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014), a TRO motion must be accompanied by a memorandum of law. M.D. Tenn. L.R. 65.01(b). Third, the motion for a TRO must be supported, at a minimum, by "an affidavit or a verified complaint." Fed. R. Civ. P. 65(b)(1)(A); *see also* M.D. Tenn. L.R. 65.01(b) (explaining that a motion for a TRO "must be accompanied by a separately filed affidavit or verified written complaint"). Finally, the moving party must certify in writing "any efforts made to give notice and why it should not be required." Fed. R. Civ. P. 65(b)(1)(B). Plaintiff has met all these initial requirements, as indicated by the above references to the Complaint (Doc. No. 1), memorandum of law in support of the TRO (Doc. No. 8–3), and affidavit (Doc. No. 8–7).

A TRO should be granted only if the movant carries his burden of proving that the circumstances clearly demand it. *Carter v. Tennessee Dep't of Child.'s Servs.*, No. 3:22-CV-

00247, 2022 WL 1144134, at *1 (M.D. Tenn. Apr. 18, 2022) (citing *Overstreet v. Lexington–Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)).

ANALYSIS

## I.     Likelihood of Success on the Merits[10]

### A.  Count I: Violation of Defend Trade Secrets Act and Count II: Violation of Tennessee Uniform Trade Secrets Act

As noted above, Plaintiff has brought claims for misappropriation of trade secrets under both the DTSA and TUTSA. "The respective requirements for establishing misappropriation under these statutes are largely the same, and so the Court will conduct a single analysis." *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-00362, 2021 WL 1663574, at *11 (M.D. Tenn. Apr. 28, 2021) (citing *Great Am. Opportunities, Inc. v. Cherry Bros., LLC*, No. 3:17-CV-1022, 2018 WL 418567, at *3 (collecting cases)); *Allergan, Inc. v. Revance Therapeutics, Inc.*, No. 3:23-CV-00431, 2024 WL 38289 (M.D. Tenn. Jan. 3, 2024). To succeed on a trade secrets misappropriation claim, a plaintiff must show "(1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *ProductiveMD, LLC v. 4UMD, LLC,* 821 F.Supp.2d 955, 962 (M.D. Tenn. 2011) (citation omitted); *see also* 18 U.S.C. § 1839.

Plaintiff is likely to succeed on the merits of its misappropriation of trade secrets and breach of contract claims because Defendant already admitted under oath that she improperly (that is, in breach of a duty of secrecy, as explained below) downloaded and emailed to her personal email account thousands of confidential documents containing proprietary information and trade secrets belonging to Plaintiff while employed by Plaintiff. Additionally, there is a risk of further violations

---

[10] In this section, the Court states various facts in an unqualified manner, for ease of reading. But to be clear, these statements are based on the current state of the record, are subject to change, and do not reflect the Court's final conclusion as to the applicable facts. Instead, they represent only the Court's view, based solely on the current record, of facts that are *likely* to be established.

because Defendant has retained this confidential information and trade secrets after accepting employment with a direct competitor of Plaintiff, raising question of whether she intends to disseminate the information to her new employer.

"TUTSA lists three requirements for information to be considered a trade secret: (1) the information must derive independent economic value from not being generally known, (2) others could obtain economic value from its disclosure or use, and (3) efforts have been made to maintain its secrecy." *J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-CV-2847-JPM-CGC, 2010 WL 3069818, at *4 (W.D. Tenn. Aug. 4, 2010) (citing Tenn. Code Ann. § 47-25-1702(4)); *see also Williams-Sonoma Direct, Inc.*, *v. Arhaus, LLC*, 109 F.Supp.3d 1009, 1017 (W.D. Tenn. 2015) (quoting *J.T. Shannon Lumber*).[11]

---

[11]As this Court has previously explained:

 [S]ome factors [are] relevant to whether information is a trade secret under Tennessee law:

(1) the extent to which the information is known outside of the business;
(2) the extent to which it is known by employees and others involved in the business;
(3) the extent of measures taken by the business to guard the secrecy of the information;
(4) the value of the information to the business and to its competitors;
(5) the amount of money or effort expended by the business in developing the information;
(6) the ease or difficulty with which the information could be properly acquired or duplicated by others[.]

*Great Am. Opportunities, Inc.*, 2018 WL 418567, at *4 (quoting *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)). These six factors originated in cases discussing the common law misappropriation of trade secrets. *E.g.*, *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001). However, they have still been found relevant by courts (including this Court) to the analysis of whether information is a trade secret under TUTSA. *E.g.*, *SDC Fin., LLC v. Bremer*, No. 3:19-CV-00525, 2019 WL 4393543, at *4 (M.D. Tenn. Sept. 13, 2019); *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, No. 3:06-CV-170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006), *aff'd*, 246 F. App'x 969 (6th Cir. 2007); *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 961 (M.D. Tenn. 2011). However, cases noting the distinction between TUTSA and the common law have not applied the factors (also without comment). *Williams-Sonoma Direct, Inc.*, 109 F. Supp. 3d at 1018; *J.T. Shannon Lumber Co.*, 2010 WL 3069818, at *4.

Therefore, the Court believes the appropriate analysis is to assess the three requirements prescribed by TUTSA, as enumerated in *J.T. Shannon Lumber Co.*, 2010 WL 3069818, at

The documents contain trade secrets. Plaintiff has indicated that this information was confidential, that Plaintiff went to efforts to keep the information confidential (most relevant here being the requirement that a new employee signing a confidentiality agreements before being providing access to such information),[12] and that the information has high value because it details internal proprietary processes and decision making, clients, potential clients, and their contact information, pricing and financial statements, and other sensitive business data as described above. *See, e.g.*, *Fidelity Brokerage Servs. LLC v. Clemens,* No. 2:13-CV-239, 2013 WL 5936671, at *9 (E.D. Tenn. Nov. 4, 2013) (holding that the following may be trade secrets: "customer names, addresses and phone numbers" where former employee had repeated contacts with customers and

---

*4. However, the concepts and considerations reflected in the six factors certainly appear to be variously relevant to the analysis of the three requirements. Though weighing the six factors is not the appropriate test for Plaintiff's TUTSA claim, the six factors are not wholly irrelevant to the Court's analysis herein.

*PSC Indus.*, 2021 WL 1663574, at *12 n. 20 (M.D. Tenn. Apr. 28, 2021)

[12] Plaintiff also asserts that it protects its information in other ways:

> [Plaintiff] requires every new hire to sign a confidentiality agreement before gaining access to GEP's internal systems. GEP maintains an "Acceptable Use Policy" that prohibit employees from sending sensitive company or client data to personal email accounts or other personal storage mediums, which [Defendant] electronically acknowledged on August 31, 2023; GEP provides Data Security Training on a regular basis, including a required acknowledgment of all employees about the importance of following GEP's policies to safeguard GEP's confidential information and trade secrets from unauthorized acquisition, disclosure, or use; GEP uses tools to provide access to files on an as needed basis, keeping files generated by [Defendant]'s department—the Tax Incentives Department—on a segregated workspace within Microsoft Teams where authorized users must use their Office 365 credentials (user name and password) to gain access to the Incentives Department's confidential work product; GEP limits access to the Incentives Department's workspace within Microsoft Teams to those users approved by the Incentives Department leadership; GEP protects some particularly sensitive files, like the operating plans [Defendant] took, with their own document-specific password; GEP may monitor and detect when an employee has improperly sent out GEP confidential information during the course of employment (as it did in [Defendant]'s case, which led to her immediate termination of employment); and pursuant to its Personnel Security Standard, GEP disables an employee's access to its digital workspaces immediately upon termination.

(Doc. No. 8-3 at 15) (citation omitted).

also knew their "confidential, personal and financial information"); *Hamilton-Ryker Grp., LLC v. Keymon,* No. W2008–00936–COA–R3–CV, 2010 WL 323057, at *15 (Tenn. Ct. App. Jan. 28, 2010) (information such as production schedule, internal profit analysis, mailing addresses, and recent invoices were trade secrets); *ProductiveMD,* 821 F.Supp.2d 955, 961–62 (M.D. Tenn. 2011) ("[C]ustomer lists, sales strategy and tactics, proprietary information regarding pricing and billing records, methodology for billing codes, knowledge of [] customer needs, [] products and services, as well as knowledge of other forms and procedures used in the business" may be trade secrets); *Great Am. Opportunities, Inc.,* 2018 WL 418567, at *5 (M.D. Tenn. Jan. 16, 2018) (trade secrets may consist of "detailed information regarding both [plaintiffs'] customers themselves and those customers' past individualized" orders with plaintiffs); *PGT Trucking, Inc. v. Jones,* No. 15-1032, 2015 WL 4094265, at *3 (W.D. Tenn. July 7, 2015) (trade secrets may consist of "information relating to customers, rates, and owner-operators or independent contractors [used] to compete with the company").

Defendant misappropriated the trade secrets. The Defend Trade Secrets Act ("DTSA") defines misappropriation as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who–
> > (i) used improper means to acquire knowledge of the trade secret;
> > (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was–
> > > (I) derived from or through a person who had used improper means to acquire it;
> > > (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain [its] secrecy or limit [its] use ....

18 U.S.C.§ 1836(5); *see also* Tenn. Code Ann. § 47-25-1702(2).

"Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and does not include . . . any other lawful means of acquisition." 18 U.S.C. § 1839(6); Tenn. Code Ann. § 47-25-1702(1).; *Allergan*, 2024 WL 38289, at *7 ("if a plaintiff shows that a defendant merely acquired (without also using or disclosing) the plaintiff's trade secret(s), then indeed the plaintiff must show that the defendant did so by 'improper means.'").

Defendant admitted in her Declaration that "[d]espite [her] assurances to the contrary, on January 10, 2024, and January 11, 2024, [she] sent [Plaintiff's] Confidential Information to two of [her] personal email addresses." (Doc. No. 8-7 at 20). By downloading and emailing Plaintiff's data to her personal email account after providing notice of her intention to resign her employment and retaining them after employment, Defendant breached her agreement with Plaintiff and took information from Plaintiff through improper means, constituting misappropriation. See *Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4192072, at *14 (N.D. Ill. Sept. 15, 2021) (court found there was a reasonable likelihood of success on a misappropriation claim when an employee "forwarded emails from his Aon email address to his personal email address.").[13]

Finally, there is significant detriment to Plaintiff both in terms of its reputation (as the information contains significant amounts of confidential client information, the confidentiality of which Plaintiff is obligated to protect under pain of damage to its reputation) as well as its finances (as the information would allow competitors to gain an advantage). The harm to plaintiff is also described further below in the discussion of the irreparable injury requirement of the TRO.

---

[13] While the Court determines here that Plaintiff is likely to succeed on the merits based on acquiring the data improperly, there is also a significant risk of misappropriation by disseminating that data to TPC, the new employer. Because Defendant is going to work for a direct competitor, she did not download the information until she planned to work for that competitor, and she attempted to furtively maintain control over the documents despite professing to have deleted the material, there is circumstantial evidence that she intends to disseminate the data to the new employer.

B.  <u>Count III: Breach of Contract</u>

"Under Tennessee law, 'a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract; and (3) damages caused by the breach of the contract.'" *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2019 WL 6050283, at *3 (M.D. Tenn. Nov. 15, 2019) (quoting *Lewis v. MedAssets Net Revenue Sys., LLC*, No. 3:11-cv-0387, 2012 WL 3061855, at *10 (M.D. Tenn. July 26, 2012)).

Defendant executed a contract with Plaintiff which imposed upon Defendant contractual obligations restricting the disclosure of Plaintiff's confidential and proprietary information and trade secrets. Among other statements regarding confidentiality, that agreement includes

> No Improper Use or Disclosure. At all times during and after the end of Employee's employment with GEP, Employee will hold in trust, keep confidential and not use, reproduce, disclosure, furnish, reveal, communicate, transfer or make accessible any Confidential Information to any third party (or any employee of GEP not having any need to view or receive such information) at any time in any form for so long as any such information shall remain secret or confidential or otherwise remain protectible to any extent, except (1) as may be necessary in the course of Employee's employment with GEP and for the benefit of GEP or (2) as compelled by legal process, in which case, Employee shall immediately notify GEP and cooperate with GEP in efforts to limit disclosure. This paragraph 2(c) applies, without limitation, to unauthorized use of Confidential information in any medium, writings of any kind containing such information or materials, including books, and articles, web-logs (blogs), websites, electronic mail or writings of any other kind, or film, videotape, audiotape, computer files, or digital/electronic media or data storage devices (e.g., DVDs, CDs, cellular phones, hand-held, lap-top or desktop computers, built-in/portable computer data hard drives, or any other device storing or displaying electronic or digital information).

(Doc. No. 1 at 4 (quoting 1-1 ¶ 2(c))). It also includes the following:

> Return of GEP's Property. At the end of Employee's employment with GEP, Employee shall promptly return to GEP all items or materials containing any Confidential Information and all other GEP property in Employee's possession, custody, or control, including equipment, documents, things, notes, files, records, data, prototypes, and models (whether made or prepared by Employee or otherwise coming into Employee's possession or control and whether originals or copies). Employee shall not retain any written or other tangible or reproducible material

containing any information concerning or relating to any Confidential Information or Inventions. Employee shall delete all Confidential Information from any computers, external hard drives, e-mail accounts, cellular phones, personal digital assistants, or any other data storage devices owned or used by Employee outside of GEP's workplace prior to separation of employment.

(*Id.* (quoting 1-1 ¶ 7(a))).[14]

These terms clearly require Defendant to return all of Plaintiff's confidential information at the end of her employment, which is something that (according to her sworn statement) she did not do. Moreover, she then lied about deleting and returning control over the data she had taken to correct her breach. Even if she has at some later point deleted the content, the breach already occurred.

Plaintiff argues that it has been harmed because it "has had to incur significant time, expense, and attorneys' fees to investigate the extent of [Defendant]'s breach already, and it has suffered irreparable harm in the form of the loss of control over its confidential information and trade secrets." While the first of these harms (the investigation, pre-litigation, and litigation costs) cannot sustain a TRO, they can sustain a breach-of-contract claim, meaning Plaintiff is likely to succeed on the merits of that claim. Additionally, the loss of control of the information resulting from the breach is a harm to support breach of contract and can also be an irreparable harm to sustain a TRO, so long as Plaintiff would suffer that harm absent a TRO, as discussed below.

## II.   Irreparable Harm

The risk of irreparable harm is obvious. The thousands of documents include client information, internal operating procedures that Plaintiff has perfected over time, analyses and

---

[14] Additionally, Defendant has agreed to (1) the fact that a breach of the confidentiality agreement "may cause GEP irreparable harm for which money is inadequate compensation" and (2) "the issuance of any restraining order . . . which arises . . . from or relates to any . . . violation of the . . . Agreement" and that "GEP will be entitled to injunctive relief to enforce this Agreement." (Doc. No. 1 (quoting 1-1 ¶8) (internal quotation marks removed)).

reports that they have planned and developed for internal use, sensitive financial data, as well as client projects. *See Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 785 (6th Cir. 2003) ("The existence of an actual threat of irreparable injury may be established by showing that the employee possessed knowledge of the employer's trade secrets.")

Importantly, much of this is sensitive client data that not only poses a risk of competition but importantly can degrade client trust if a client feels Plaintiff has been haphazard with their information. *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute"); *AmericaGas Propane v. Cook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993) ("The loss of customer goodwill and injuries that are a consequence of unfair competition are difficult to compute and certainly constitute irreparable harm.").

Defendant has access to thousands of these highly confidential documents that she only took into her personal possession after finding out she was working for a competitor. Defendant's deceit in deleting the data, her continued delays in submitting to the forensic examination she voluntarily agreed to, and her sudden refusal to further delay her start provides an imminent threat that she intends and perhaps always intended to retain the information for use with her new employer. *See Uniroyal Goodrich Tire Co. v. Hudson*, 97 F.3d 1452 (6th Cir. 1996) ("The 'threat' of disclosure can establish immediate irreparable harm in some situations."). "An employer has a legitimate business interest in keeping its former employees from using the former employer's trade or business secrets or other confidential information in competition against the former employer." *Western Excelsior Corp. v. Propex Operating Company, LLC*, No. 1:16-CV-506, 2017 WL 11195421, at *2 (E.D. Tenn. Sept. 6, 2017) (citing *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d

471, 473 (Tenn. 1984)); *Uniroyal Goodrich Tire Co. v. Hudson*, 97 F.3d 1452 (6th Cir. 1996) ("the loss of fair competition resulting from the breach of a no-compete agreement may harm an employer irreparably" (citing *Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir.1992)).

Plaintiff has lost the ability to control and have responsibility for the security of its information, allowing for potential future exposure to the public or other parties without Plaintiff's consent or control. Plaintiff is thus at risk if irreparable harm.

### III.     Substantial Harm to Others

Turning to the third requirement, the Court must ensure that issuing the injunction would not result in substantial harm to others. *See Certified Restoration*, 511 F.3d at 550 (internal quotation omitted); *Patel v. AR Grp. Tennessee, LLC*, No. 3:20-CV-00052, 2020 WL 5849346, at *9 (M.D. Tenn. Oct. 1, 2020).

Regarding harm to Defendant from the requested TRO, there is generally no harm in being forced to comply with the law. *Calvert Health, LLC v. Four Leaf Liquidators, LLC*, No. 3:23-CV-00110, 2024 WL 69953, at *10 (M.D. Tenn. Jan. 5, 2024) ("Defendants face no hardship as a consequence of their compelled compliance with federal law. Nor do they face hardship in complying with their obligations under [a contract]. It is generally not a hardship to comply with lawful obligations" (quoting *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2020 WL 4735031, at *6 (M.D. Tenn. Aug. 14, 2020) (citations omitted))).

Although Plaintiff asserts that no harm would befall Defendant from Plaintiff's requested TRO, it seems that Defendant could lack access to her accounts and devices while they are being examined, though that is unclear from the information given.[15] Nevertheless, "the Court notes that

---

[15] As stated in the accompanying TRO, the terms of the TRO require, among other things, a third-party accounting of Defendant's accounts and devices to ensure that Plaintiff's documents and data have been deleted and properly secured.

any hardship to Defendant[] is mitigated by the necessarily short duration of this relief. *See* Fed. R. Civ. P. 65(b)(2) (a temporary restraining order 'expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension')." *Fed. Trade Comm'n v. ACRO Servs. LLC*, No. 3:22-CV-00895, 2022 WL 17177641, at *4 (M.D. Tenn. Nov. 21, 2022). Additionally, this *potential* for limited access to her accounts and devices is significantly outweighed by the potential harm to Plaintiff, and it is lessened in the Court's eyes by the fact that, according to the facts currently before the Court, Defendant has at all times expressed a willingness to comply with a forensic examination and had ample opportunity to do so in a way that could have been more convenient to her but instead chose not to. Such purported acceptance of the examination tends to indicate that Defendant would experience minimal harm from a comparable examination being required by the terms of the TRO, and her unwillingness to comply with the examination to which she agreed discounts the significance of any harm that the TRO would visit upon her because she had—but squandered—an opportunity to avoid (by preventing the need for a TRO-mandated examination in the first place) any inconvenience that a TRO-created lack of access would cause. The Court notes that this is a unique situation in which there is no evidence that Defendant ever renounced her agreement to undergo the forensic examination. Instead, she agreed to the examination but continued to put if off until the point that Plaintiff perceived the need to seek judicial intervention.[16]

---

[16] The Court does not view Schmeiser's report as an indication of Plaintiff's attempt to make good on her agreement to participate in the forensic examination, as the report is grossly inadequate and could not reasonably be expected to address Defendant's concerns. For example, the failure to examine the email accounts alone fails to reasonably respond to the concerns since the email accounts were the method by which Defendant provided herself access to Plaintiff's data and files. But even if Schmeiser's examination could be seen as Defendant engaging in the self-help described above, the only harm to Defendant visible to the Court on the current record remains the *potential* for limited access to her accounts and devices and

The primary hardship to other parties in this case would be to TPC, the third-party competitor that Defendant has begun to work for. Plaintiff argues that TPC would not be (or at most would be only minimally) harmed because Defendant represented that TPC acquiesced in her requests to defer her start date for the forensic investigation. The Court disagrees. It is unknown what Defendant told TPC in order to obtain TPC's acceptance of a deferral in her start date, and none of the allegations made so far implicate TPC as a conspirator in Defendant's alleged misappropriation of trade secrets and breach of contract. TPC could be harmed by a continuing delay of the commencement of duties of an incoming employee in a vice president role—which presumably, given its title, is a role of importance that TPC would not want vacant for extended periods of time. The potential harm to TPC would be both to TPC's business (from any loss of productivity or resources in delaying Defendant's start date) but also to TPC's freedom of contract and ability to form employment relationships. As described below, this potential harm is mitigated by a Court-conceived provision in the TRO that limits Plaintiff's requested relief by omitting a provision that would categorically prevent Defendant from working at TPC at all until the requested forensic examination is completed, and instead limits employment only if Plaintiff refuses to forfeit access to her relevant accounts and devices until a required forensic examination is complete. Without Plaintiff's proposed provision that necessarily would entirely prohibit Defendant's employment at TPC pending the forensic examination, any harm to others resulting from the TRO is not substantial enough to prevent the establishment of this third requirement for a TRO to be granted.

_____

even that is only for the limited time period of a TRO. As such, the harm to Plaintiff significantly outweighs any harm to Defendant.

## IV.    Public Interest

The requested TRO (as modified and issued by the Court) clearly serves the public interest by discouraging unfair practices relating to trade secrets and encouraging federal law. *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 785 (6th Cir. 2003) ("the public has an interest in discouraging unfair trade practices" which include "conversion of trade secrets and unfair competition"); *DISH Network L.L.C. v. Simmons*, No. 4:17-CV-53, 2018 WL 3647169, at *8 (E.D. Tenn. June 28, 2018) ("the public interest is served by enjoining activities that violate federal law").

Plaintiff asserts that "Tennessee has a strong public policy in favor of upholding contracts." *Amerigas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993). This cuts both ways in this case. On one hand, the public interest in freedom of contract favors a TRO that enforces the confidentiality agreement between Plaintiff and Defendant; on the other hand, it favors freedom of contract and cuts against interfering with the employment relationship between Defendant and third-party, TPC.

As such, the public interest requirement supports issuing a TRO, albeit one that appropriately modifies Plaintiff's requested provision that would categorically prevent Defendant from working at TPC at all until the requested forensic examination is completed.

## V.    Injunctive Relief Requested

Having determined that all four requirements for a TRO have been met, the Court will issue a TRO and provide injunctive relief to Plaintiff to protect its trade secrets. The injunctive relief will be laid out in a corresponding order, but the Court notes two changes to the requested relief.

First, "Federal Rule of Civil Procedure 65 requires that any injunction both be 'specific in its terms' and 'describe in reasonable detail, and not by reference to the complaint or other

document, the act or acts sought to be restrained.'" *Calvert Health, LLC v. Four Leaf Liquidators, LLC*, No. 3:23-CV-00110, 2024 WL 69953, at *10 (M.D. Tenn. Jan. 5, 2024) (quoting Fed. R. Civ. P. 65(d)). Accordingly, language in the proposed TRO will be revised to avoid reference to the Complaint and the confidentiality agreement.

Second, Plaintiff requests that Defendant be enjoined from working at TPC until the forensic examination and renumeration of her accounts and devices are complete. Most cases where a court enjoins employment, particularly the employment of a previous employee with a third-party employer, involve a noncompete agreement between plaintiff–employer and defendant–ex-employee. While the Court takes seriously Plaintiff's concerns that Defendant could share Plaintiff's trade secrets with a competitor, she is enjoined from doing so per the terms of the TRO, and therefore that concern is already alleviated. The Court is not comfortable interfering with a third party's ability to hire and retain employees when the only reason is to prevent dissemination of information that the Court has otherwise enjoined the employee from disseminating.

"[T]hese circumstances favor[] an injunction 'specifically focused' on [Defendant's] use of any misappropriated trade secrets." *See Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1210 (E.D. Cal. 2020) (quoting *Pyro Spectaculars*, 861 F. Supp. 2d at 1093). "[T]he court will avoid undermining the public interest in promoting the mobility of employees, subject to lawful restrictions including the protection of trade secrets." *Id.*; *see also Pyro Spectaculars*, 861 F. Supp. 2d at 1093 (finding public interest supported injunction "specifically focused on preventing misuse of PSI's trade secrets to solicit PSI's customers" where plaintiff satisfied the three other preliminary injunction requirements). Accordingly, the TRO will not enjoin Defendant from working for TPC so long as Plaintiff's trade secrets are not within her control. That is, so

long as Plaintiff forfeits access to her accounts and devices during the period of the forensic examination, she can maintain her employment with TPC, but so long as she can access any sources where information could still be stored, she cannot work for TPC.

<u>CONCLUSION</u>

For the reasons discussed herein, the Motion (Doc. No. 8) will be GRANTED in part, i.e., granted with respect to Plaintiff's request for a TRO inasmuch as a TRO will be issued in the accompanying Temporary Restraining Order. The Motion will remain pending to the extent that it requests a preliminary injunction.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE